**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **NO. 25-cr-269 (TSC)** |
| **RICARDO DEMAR BLACKSON,** | |
| **Defendant.** | |

**GOVERNMENT'S SURREPLY IN OPPOSITION TO**
**MOTION TO SUPPRESS EVIDENCE**

Defendant Ricardo Blackson raises a new ground for suppressing the physical evidence against him in this case: he claims that the K-9 who detected that evidence impermissibly trespassed onto and into his car. *See* Def.'s Reply in Support of Mot. to Suppress ("Def.'s Reply"), ECF No. 21. It did not. The K-9 detected the firearm and ammunition—thus giving rise to probable cause justifying a search—by the time of its first contact with Blackson's car. Moreover, the K-9's first contact was not a search because the K-9 acted instinctually, not at its handler's direction. And the K-9's behavior immediately after that first contact confirmed that it had positively identified contraband. Finally, even if the K-9's actions constituted unlawful searches, the suppression rule should not apply because the K-9 would have detected the firearm and ammunition regardless. The Court should reject Blackson's challenge to the K-9 sniff.

**SUPPLEMENTAL STATEMENT OF FACTS**

Metropolitan Police Department K-9 Officer Stephen Alston and his K-9 partner Joker performed the sniff of Blackson's car.[1] The pair had completed the Department's 320-hour Basic

---

[1] Footage of the sniff from Officer Alston's body-worn camera is attached as Exhibit C. Body-worn camera footage of the sniff from the vantage points of two other Metropolitan Police

Firearms Detector Dog Training Course several months earlier. *See* Ex. F at 1 (Officer Alston and Joker's detection training records). Joker was trained to detect only firearm evidence—specifically, smokeless gunpowder, the scent of which emanates most potently from live ammunition. Prior to the sniff of Blackson's car, Joker had demonstrated through several tests in controlled settings that he could in fact sniff out hidden firearms. *See id.* at 2–8.

On the afternoon of the sniff, Officer Alston retrieved Joker from his police cruiser, held him on a leash with one hand, and directed him toward Blackson's car from the rear. *See* Ex. C at 14:43:10. All four of the car's windows were rolled down—as they were when Officers Brennan and Callahan first encountered the car. *See id.* at 14:43:13–14:43:20; *see also* Ex. A at 14:17:44; Ex. B at 14:17:44.

When the pair neared Blackson's car, Joker tried to walk toward the driver's side of the car—where the nearest open window was—even though his and Officer Alston's practice is to start a sniff at the front passenger's side. *See* Ex. C at 14:43:13–14:43:15; Ex. E at 14:43:13–14:43:15. Officer Alston used the leash to redirect Joker toward the passenger's side. *See* Ex. C at 14:43:13–14:43:15; Ex. E at 14:43:13–14:43:15.

---

Department officers are attached as Exhibits D and E. Still photos in this brief come from Officer Alston's body-worn camera footage unless otherwise noted.



**Joker Attempts to Walk Toward the Driver's Side of Blackson's Car**

After Officer Alston and Joker walked behind the car, Joker darted toward the rear passenger's side of the car. *See* Ex. C at 14:43:19; Ex. D at 14:43:19. The rear passenger's side window was open. *See* Ex. C at 14:43:19; Ex. D at 14:43:19. Officer Alston reigned in Joker's leash and told him, "No." *See* Ex. C at 14:43:20; Ex. D at 14:43:20.



**Joker Darts Toward Blackson's Car on
Officer Alston's Body-Camera Footage**



**Joker Darts Toward Blackson's Car on Another
Officer's Body-Camera Footage (from Exhibit D)**

As Officer Alston adjusted Joker's collar to notify him that he would be asked to detect a firearm, Joker again tried to walk back toward Blackson's car. *See* Ex. C at 14:43:25–14:43:30; Ex. D at 14:43:25–14:43:30.  Officer Alston again pulled Joker's leash to restrain him. *See* Ex. C at 14:43:27.



**Officer Alston Restrains Joker from Walking Toward Blackson's Car**

Once Officer Alston finished adjusting the collar, he and Joker approached the car's front to perform the sniff. *See* Ex. C at 14:43:35–14:43:38; Ex. D at 14:43:35–14:43:38.  Officer Alston

4

told Joker to "sit" near the front passenger's side tire, and Joker complied. *See* Ex. C at 14:43:38–14:43:45; Ex. D at 14:43:38–14:43:45. Officer Alston then initiated the sniff by pointing his leash-free hand toward the tire and saying, "Check." *See* Ex. C at 14:43:46; Ex. D at 14:43:46. He walked backward with his fingers pointing at the car's bumper as Joker quickly sniffed from one front tire to the other alongside the bumper. *See* Ex. C at 14:43:36–14:43:50; Ex. D at 14:43:36–14:43:50.

After Joker had sniffed the front of the car, Officer Alston extended his free hand toward the front driver-side tire and again said, "Check." *See* Ex. C at 14:43:51; Ex. E at 14:43:51. He walked backward alongside the driver's side of the car while Joker sniffed the driver's door. *See* Ex. C at 14:43:51–14:43:54; Ex. E at 14:43:51–14:43:54. Meanwhile, Officer Alston dropped his free hand down by his leg. *See* Ex. E at 14:43:54.

As Officer Alston walked past the driver's door toward the rear driver's side door, however, Joker leapt up onto the side of the car. *See* Ex. C at 14:43:55; *See* Ex. E at 14:43:55. The government expects that Officer Alston will testify that Joker leapt onto the car without Officer Alston's prompting. Joker put his paws on the driver's door and poked his nose toward—and possibly through—the open driver's window. *See* Ex. C at 14:43:55–14:43:58. When Officer Alston waved his hand away from the car, Joker returned to all fours. *See id.* at 14:43:58.



**Joker Leaps onto Blackson's Car for the First Time**



**Officer Alston with His Free Hand Down as
Joker Leaps onto Blackson's Car (from Exhibit E)**

Officer Alston pointed two fingers at the car's rear driver's side door and tire and again said, "Check." *See* Ex. C at 14:44:00; Ex. E at 14:44:00. Joker merely looked up at the open window and then back at Officer Alston. *See* Ex. C at 14:44:00; Ex. E at 14:44:00. Officer Alston pulled Joker's leash to direct him away from the car before reapproaching the rear driver's side. *See* Ex. C at 14:44:01–14:44:04; Ex. E at 14:44:01–14:44:04.

Officer Alston retried the command.  He pointed—first at the rear driver-side tire, then at the open rear driver-side window—and told Joker to "check."  *See* Ex. C at 14:44:04; Ex. E at 14:44:04.  After Officer Alston pointed to the window, Joker again leapt onto the car.  *See* Ex. C at 14:44:05; Ex. E at 14:44:05.  He put his paws on the car and his nose through the window.  *See* Ex. C at 14:44:05; Ex. E at 14:44:05.



**Joker Leaps onto Blackson's Car for a Second Time**

As Officer Alston pointed toward the open driver's window, Joker returned to all fours, looked at Officer Alston, and appeared to crouch his hind legs before darting toward a toy in Officer Alston's hand.  *See* Ex. C at 14:44:06–14:44:09; Ex. E at 14:44:06–14:44:09.  Officer Alston tightened Joker's leash and responded, "No.  I want you to sit legitimately."  *See* Ex. C at 14:44:09.  He then pointed at the driver's side of the car and again to the driver's open window. *See* Ex. C at 14:44:10–14:44:13; Ex. E at 14:44:10–14:44:13.  Joker clamored up onto the driver's door and looked around without putting his nose through the window.  *See* Ex. C at 14:44:13–14:44:16.  When Officer Alston waved his hand away from the car, Joker returned to all fours. *See* Ex. C at 14:44:15–14:44:17.



**Joker Leaps onto Blackson's Car for a Third Time**

Joker sat down—his trained sign to indicate the presence of a firearm.  *See* Ex. C at 14:44:18; Ex. E at 14:44:18.  Officer Alston handed him a toy, and the two walked away from Blackson's car.  *See* Ex. C at 14:44:19; Ex. E at 14:44:19.

U.S. Park Police's subsequent search of the backpack uncovered, among other things, a handgun loaded with one round of ammunition in the chamber and ten rounds of ammunition in an attached magazine.

## LEGAL STANDARD

When a government actor seeks to "obtain[] information by physically intruding" on private property, a search under the Fourth Amendment has occurred.  *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)).  Critically, however, "[t]respass alone does not qualify" as a search—the trespass must "be conjoined with . . . an attempt to find something or to obtain information." *Jones*, 565 U.S. at 408 n.5.  For that reason, "a mere physical touching, such as when an officer leans on the door of a car while questioning its driver," is not a search.  *United States v. Richmond*, 915 F.3d 352, 357 (5th Cir. 2019).

Furthermore, even when a search has occurred unlawfully, it does not trigger the exclusionary rule unless "the constitutional violation is 'a but-for cause of obtaining evidence,' provided that causal connection is not 'too attenuated.'" *United States v. Weaver*, 808 F.3d 26, 34 (D.C. Cir. 2015) (quoting *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)).

## ARGUMENT

The Court should not suppress evidence in this case based on Joker's physical contacts with Blackson's car. None of Joker's contacts constituted an unlawful search. They were all either supported by probable cause or merely instinctual dog behavior that did not rise to the level of a search. And in any case, Joker's contacts were not but-for causes of law enforcement obtaining the evidence that Blackson seeks to suppress. Joker would have detected the firearm evidence regardless.

### 1.    Any Trespass Joker Committed Was Not an Unlawful Search.

Joker's three contacts with Blackson's car were not unlawful searches because they came after he detected the presence of a firearm and established probable cause. A reliable police dog's detection of contraband provides probable cause to search a car. *See Florida v. Harris*, 568 U.S. 237, 248 (2013).[2] And the dog does not need to give "his trained indication" to signal his detection. *See United States v. Moore*, 795 F.3d 1224, 1232 (10th Cir. 2015) (internal quotation marks and citation omitted). It is enough if the dog acts in such a way that reasonably leads law enforcement to believe that a search would reveal contraband. *See United States v. Shen*, 749 F. App'x 256,

---

[2] Blackson does not contest Joker's ability to reliably detect firearms, which Joker has demonstrated by successfully completing Metropolitan Police Department training programs. *See* Ex. F; *see also Harris*, 568 U.S. at 246–47 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

261 (5th Cir. 2018) (citing *Harris*, 568 U.S. at 248); *accord, e.g.*, *United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) ("[W]e are not concerned about Henri's failure to give a full indication . . . ."); *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013) ("Evidence from a trained and reliable handler about alert behavior he recognized in his dog can be the basis for probable cause. Whether a particular dog displays enough signaling behavior will depend on the facts and circumstances of each case.").

By the time Joker first jumped onto Blackson's car, he had detected the firearm inside. He repeatedly demonstrated interest in the car even before the sniff began. When Joker first approached the car, he tried to walk to the driver's side—where the closest open window was—although his practice is to start a sniff on the passenger's side. Officer Alston had to tug at the leash to redirect Joker to the passenger's side. Then, as Officer Alston was preparing for the sniff, Joker twice tried to approach the open rear passenger's side window—behind which was the backpack containing a firearm and 11 rounds of live ammunition. Officer Alston again had to restrain Joker using the leash and once verbally commanded him to stop.

Joker's actions after beginning the sniff made the firearm's presence even more apparent. He quickly scanned the front of the car but then parted from Officer Alston when he reached the driver's open window. While Officer Alston was walking backward and guiding Joker toward the back of the car, Joker spontaneously jumped onto the driver's door and sniffed through the window. The government expects that Officer Alston will testify based on his experience handling Joker that Joker did that because he had detected a firearm. *Cf. United States v. Pulido-Ayala*, 892 F.3d 315, 319 (8th Cir. 2018) ("Given the strong reaction of the trained drug dog while it was *outside* the car, together with Pulido-Ayala's suspicious reaction to the drug checkpoint, we conclude that police had probable cause to believe that the vehicle contained contraband in the

moment *before* Jampy actually crossed the threshold into the interior of the Mini Cooper."); *Moore*, 795 F.3d at 1231 (holding that a dog "snapping his head around before he jumped into the window of [the defendant's] car" was a signal that established probable cause).

What came next corroborates Officer Alston's expected testimony: When Officer Alston commanded Joker to continue checking the car, Joker simply looked at the car, then back at Officer Alston. The government anticipates that Officer Alston will testify that Joker's nonresponse indicated he believed his job was done. *Cf. Shen*, 749 F. App'x at 262 (holding that a police dog established probable cause when she "showed signs of interest, such as an increased breathing rate, wagging her tail, and sniffing more air through her nose" and, "[a]t one point, . . . paused, sniffed the car's door seam heavily, and stared at the passenger door seam for about one second"); *United States v. Speaks*, No. 2:25-CR-17, 2025 WL 2831388, at *10 (N.D. Tex. Oct. 6, 2025) (holding that, even though a police dog had not given its "final response" indicating the presence of narcotics, it had exhibited "other indicating behaviors" that established probable cause, such as "breathing changes," "body language changes," and "look[ing] back and forth between his handler and the locus of an odor" (emphasis omitted)).

Because Joker signaled the presence of a firearm at the moment he first leapt up onto Blackson's car, each physical contact he had with the car was accompanied by probable cause. But even if probable cause did not exist until Joker's conspicuous nonresponse after the first contact, that first contact was not an unlawful search. Police dogs are not ordinary government actors. Although trained to obey commands and detect contraband, a police dog is not under the complete control of its handler. Courts have thus repeatedly held that a police dog's trespass does not constitute a search when the dog acts instinctively rather than as the result of "assistance, facilitation, or other intentional action by its handler." *See United States v. Pierce*, 622 F.3d 209,

214 (3d Cir. 2010); *see also, e.g.*, *United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009) ("[W]e have upheld the legality of such a sniff during a lawful detention when, as here, (1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog."). In other words, a police dog's trespass is a search only when its handler facilitates the trespass or directs it to obtain information—not when the dog acts of its own accord.

Joker's first contact with Blackson's car was instinctive. As body-worn camera footage demonstrates, Officer Alston was guiding Joker toward the back of the car when Joker spontaneously jumped up to the open driver's window. *See* Ex. C at 14:43:51–14:43:55; Ex. E at 14:43:51–14:43:55. Unlike the second and third contacts, Officer Alston did not direct the first contact by pointing at the window and commanding Joker to "check" it. His hand stayed by his side. *See* Ex. E at 14:43:54. Joker's instinctive contact—from putting his paws on the car to his nose through the window—was therefore not a search. *See United States v. Wilson*, No. 22-20100, 2024 WL 3634199, at *2 n.1 (5th Cir. Aug. 2, 2024) (explaining that there was no unlawful search because "there [was] no evidence . . . that the officer directed the dog to jump through the window"); *United States v. Mostowicz*, 471 F. App'x 887, 891 (11th Cir. 2012) (similar); *United States v. Burney*, No. 7:23-CR-39, 2025 WL 2945733, at *2 (E.D.N.C. Oct. 17, 2025) (denying a suppression motion because the dog "was not prompted by [its handler] to raise up toward the window and touch the car"); *United States v. Rogers*, No. 2:24-CR-80, 2025 WL 1153261, at *7 (S.D.W. Va. Apr. 17, 2025) (similar).

Blackson's argument will affect the Court's analysis only if it determines that Joker provided law enforcement probable cause *after* his first contact with Blackson's car. Neither of the two dog-sniff cases he cites addressed a situation like this one in which the dog's behavior

established probable cause prior to—or at the moment of—the trespass. *See United States v. Buescher*, 691 F. Supp. 3d 924, 936 (N.D. Iowa 2023) ("The Government makes no meaningful attempt to discern at what point the officers had probable cause to search the vehicle."); *see also State v. Dorff*, 526 P.3d 988, 998–99 (Idaho 2023). Those cases instead suppressed the fruits of canine alerts that emerged after a dog's instinctive contacts with a car. *See Buescher*, 691 F. Supp. 3d at 936–37; *Dorff*, 526 P.3d at 998.[3]

If the Court declines to find that probable cause existed at the moment Joker first leapt onto Blackson's car, it should not adopt Blackson's "strict liability" position that disregards "the officer-handler's intent." *See Dorff*, 526 P.3d at 1003 (Bevan, C.J., dissenting). For a trespassory violation of the Fourth Amendment to occur, a government actor must commit the trespass while "attempt[ing] to find something or to obtain information." *See Jones*, 565 U.S. at 408 n.5; *see also id.* at 404 ("It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information."); *cf. Jardines*, 569 U.S. at 7–10 (explaining how police officers' "purpose" in bringing a dog to a home's curtilage to perform a sniff was relevant to determining whether the officers committed "an unlicensed physical intrusion" that violated the Fourth Amendment).

But "[i]f a police dog is acting without assistance, facilitation, or other intentional action by its handler (in [other] words . . . , acting 'instinctively'), it cannot be said that a State or governmental actor intends to do anything. In such a case, the dog is simply being a dog." *State v. Miller*, 766 S.E.2d 289, 296 (N.C. 2014). Holding law enforcement officers strictly liable for

---

[3] Blackson also cites *United States v. Powell*, 483 F.3d 836 (D.C. Cir. 2007), for the general proposition that "physically intruding into a vehicle constitutes a search." *See* Def.'s Reply at 3. That case dealt with a police officer leaning into a car to look inside. *See Powell*, 483 F.3d at 838. As described previously, courts generally treat a police dog's unprompted contact with a car differently than a police officer's intentional intrusion into a car.

every action of a living animal that the Supreme Court has recognized as a *sui generis* investigatory tool, *see United States v. Place*, 462 U.S. 696, 707 (1983), risks running afoul of the "touchstone of the Fourth Amendment[:] reasonableness," *see Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (citation omitted). And although doctrinally a separate stage of the analysis, excluding evidence discovered not due to any police misconduct but rather a dog's independent actions is also at odds with the deterrence-based rationale behind the exclusionary rule. *See Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it . . . .").

What is more, Blackson's strict liability approach runs contrary to the great weight of authority. *See, e.g.*, *United States v. Keller*, 123 F.4th 264, 268 (5th Cir. 2024) ("Numerous circuits agree that, absent police misconduct, the instinctive actions of a trained canine—including placing his paws on a vehicle's exterior—constitute incidental contact, not an unconstitutional Fourth Amendment search."); *United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012) ("We now join our sister circuits in holding that a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump."); *Pierce*, 622 F.3d at 214–15 ("[W]e apply the considerable body of jurisprudence examined above to conclude that Cole's interior sniffs, as a natural migration from his initial exterior sniffs, did not constitute a search requiring a warrant or probable cause."). And despite Blackson's suggestion that the property-based approach to searches and seizures displaced that authority, *see* Def.'s Reply at 4, courts continue to draw a distinction between handler- and dog-initiated trespasses. *See, e.g.*, *Speaks*, 2025 WL 2831388, at *9 ("While Speaks' reliance on *Jones* is understandable, the Fifth Circuit (among others) disagrees with his interpretation."); *United States v. Corbett*, 718 F. Supp. 3d 537, 563 (S.D.W. Va. 2024)

14

(applying the "general logic" of the distinction while "updat[ing] it to accord with *Jones'* instruction that a search occurs upon trespass with the intent to obtain information"). This Court should not accept Blackson's invitation to join the small minority of courts that adopt his strict liability approach.

In sum, Joker's contacts with Blackson's car were not unlawful searches. Probable cause existed at the time that Joker first climbed onto Blackson's car. If the Court disagrees, the first contact was still not an unlawful search because Joker acted instinctually. And Officer Alston certainly recognized that Joker had detected a firearm or ammunition by the time Joker gave a noticeable nonresponse to his commands—which occurred before the second and third contacts.

## 2. Joker's Contacts with Blackson's Car Were Not a But-For Cause of Law Enforcement Discovering the Firearm and Ammunition.

If the Court determines that Joker's contacts with Blackson's car did constitute unlawful searches, then it still should not suppress the evidence in the backpack because Joker would have detected the firearm and ammunition regardless. When a constitutional violation is not a but-for cause of evidence discovery, the exclusionary rule does not apply. *See Weaver*, 808 F.3d at 34 (citing *Hudson*, 547 U.S. at 592).

The circumstances of the traffic stop and Joker's behavior demonstrate that he more likely than not would have detected the firearm and ammunition even had he not touched Blackson's car. All four of the car's windows were rolled down, meaning the scent of the firearm and ammunition could freely emanate from it. *See United States v. Lyons*, 486 F.3d 367, 374 (8th Cir. 2007) (approving a district court's factual finding that, "with the window open[,] there [wa]s little doubt from the evidence . . . that Capone would have smelled the odor of the drugs . . . even if he had been reined back and held outside the plane of the window track"); *United States v. Williams*, 690

15

F. Supp. 2d 829, 845 (D. Minn. 2010) ("This Court finds that, as the open window was the strongest source of the odor, there is little doubt that the dog would have ultimately detected the narcotics, even if he had been reined back and held outside the plane of the window track." (quoting *Lyons*, 486 F.3d at 374) (internal quotation marks omitted)).  In addition, the firearm was loaded with 11 rounds of live ammunition containing smokeless gunpowder that Joker was trained to detect.  The government expects Officer Alston to testify, commonsensically, that the high number of rounds corresponded to a relatively more potent scent.  Finally, Joker's repeated attempts to approach the car's open windows before beginning the sniff indicate that he likely keyed into the scent of the firearm and ammunition as soon as he arrived on the scene.  *Cf. Lyons*, 486 F.3d at 374 ("[T]he district court found credible Sgt. Duis's interpretation of the dog's actions during the first lap around the vehicle as indicating that the odor was emanating from the vehicle.").

Because Joker would have detected the firearm and ammunition without climbing onto Blackson's car, the suppression remedy would be inappropriate here.

## CONCLUSION

The Court should deny Blackson's motion to suppress.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:     /s/ *Blake J. Ellison*
        BLAKE J. ELLISON
        Assistant United States Attorney
        TX Bar No. 24117203
        601 D Street NW
        Washington, D.C. 20530
        Phone: 202-436-5921
        blake.ellison@usdoj.gov