### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES**, <br><br> v. <br><br> **RICARDO DEMAR BLACKSON**, <br><br> Defendant. | No. 25-cr-269 |

### <u>MEMORANDUM OPINION</u>

In August 2025, police stopped Defendant Ricardo Blackson's vehicle for a handful of traffic infractions. What unfolded next, however, was no ordinary traffic stop. Rather than diligently pursuing the traffic-related mission of the stop, nearly a dozen police officers carried out an unrelated firearms investigation without reasonable suspicion to do so—or stood idly by—while a single officer took roughly 29 minutes to issue four traffic warnings. Because this unrelated investigation unreasonably prolonged Blackson's detention, the court GRANTS his Motion to Suppress Physical Evidence, ECF No. 13, and his Supplemental Motion to Suppress Statements, ECF No. 28.

### I.    BACKGROUND

On December 12, 2025, the court held an evidentiary hearing on Blackson's Motion to Suppress Physical Evidence. *See* Min. Entry (Dec. 12, 2025). The court heard testimony from Officer Christian Callahan, a three-year veteran of the U.S. Park Police, and Officer Stephen Alston, a seventeen-year veteran of the Metropolitan Police Department who has spent two years as a canine patrol officer. *See* Dec. 12 Hr'g Tr. (Rough Draft) at 2–3, 60–61 ("Hr'g Tr."). Their testimony and the other evidence establish that on August 28, 2025, at 2:17 p.m., police stopped

Blackson's vehicle in southwest Washington, D.C. because of a missing front license plate and

heavily tinted windows. Hr'g Tr. at 6–7. At least five law enforcement vehicles participated in

the stop, surrounding Blackson's car on three sides. *See* Hr'g Tr. at 22, 52; *see also* Gov't Ex. A

at 14:17:35–14:18:05 (Callahan Body-Worn Camera Footage). A dozen law enforcement

officers were present from the outset of the stop, including Officer Callahan; his partner, Officer

Kevin Brennan of the U.S. Park Police; and several agents of the U.S. Marshal Service and

Federal Bureau of Investigation who were part of a federal law enforcement surge in D.C. *See*

Gov't Ex. B at 14:21:19–14:22:57 (Brennan Body-Worn Camera Footage); *see also* Hr'g Tr. at

57, 59.

Although numerous officers were present, only Callahan and Brennan carried out any

tasks related to Blackson's traffic infractions. *See* Hr'g Tr. at 52, 54–55. Brennan—who was

more experienced and permanently assigned to Washington, D.C.—took the lead, while

Callahan—who is usually stationed in Maryland and "not familiar with writing D.C. tickets"—

followed Brennan's instructions. *Id.* at 5–6, 9–10, 49. The witnesses' testimony and the body-

worn camera footage introduced at the hearing establish the following timeline:

At 2:17 p.m., Officer Brennan greeted Blackson at the driver's side window of

Blackson's car. Brennan asked where Blackson's front license plate was, and Blackson

indicated that it was wedged between his dashboard and front windshield—not affixed to the

front of his car as required by D.C. law. Brennan then requested Blackson's license, registration,

and insurance and asked whether there were any weapons in the car, which Blackson denied.

Gov't Ex. B at 14:17:51–14:18:31. At 2:18 p.m., Brennan handed Blackson's license to

Callahan, who went to run database checks in the police cruiser. Gov't Ex. A 14:18:31–

14:22:38. Callahan took four minutes to check Blackson's license against three databases

containing information regarding Blackson's driving status, criminal history, and whether he had any outstanding warrants. *See* Hr'g Tr. at 21–27. While Callahan ran these checks, Brennan continued to question Blackson. Gov't Ex. B. at 14:18:31–14:19:22.

At 2:19 p.m., after spotting a green camouflage backpack tucked behind the front passenger seat of Blackson's car, Brennan asked Blackson whether there was anything "wild" in the backpack. Blackson replied, "nah, nah, that's my kid's backpack." Brennan asked Blackson how many kids he had; Blackson said "three." Brennan then asked Blackson where he worked, whether he had previously been pulled over for the plate violation, and whether he had a criminal history. After Blackson informed Brennan that he had served time for murder, Brennan asked if he could search the backpack. Blackson asked why Brennan wanted to search the car, and Brennan clarified he only wanted to look inside the backpack. Blackson politely declined and was calm throughout this interaction. Gov't Ex. B. at 14:19:23–14:20:43.

At 2:20 p.m., right after Blackson declined Brennan's request to search the backpack, Brennan ordered Blackson out of his car and told him to stand at the rear of the vehicle. Brennan questioned Blackson again about the backpack. Blackson remained calm, said there was nothing in the backpack, and stated that he was not sure why Brennan wanted to search his vehicle. Brennan clarified that he only wanted to search the backpack. Blackson replied that he was not consenting to any search. Gov't Ex. B. at 14:20:43–14:22:48.

At 2:22 p.m., after Officer Callahan finished running the database checks and emerged from the police cruiser, Officer Brennan asked him to start writing a warning for the front plate violation. Gov't Ex. B at 14:22:48–14:22:52. Callahan then searched the police cruiser for Brennan's citation pad while Brennan visually inspected the interior of Blackson's car from the outside. Gov't Ex. A at 14:22:53–14:24:00; Gov't Ex. B. at 14:22:53–14:23:45.

At 2:23 p.m., Brennan instructed Callahan to write Blackson a warning for the window tint once he finished writing the warning for the front plate violation. Brennan then got inside the police cruiser and began searching a database for Blackson's criminal history, which Callahan had already checked. Brennan relayed to another officer that Blackson was on probation for committing murder while armed. The other officer asked whether Brennan had anything on Blackson that could justify an inventory search of the vehicle. Brennan said he did not. Gov't Ex. B at 14:23:47–14:25:00.

At 2:25 p.m., Callahan began writing the first warning for the front plate violation. *See* Gov't Ex. A at 14:24:59–14:25:01. Brennan, meanwhile, was still in the police cruiser scrolling through a database and speaking with the other officer, who suggested that Brennan could frisk the backpack for weapons if Blackson was giving "any indications." Brennan replied that Blackson had shown "just a little bit of nervousness" and was "just not acting right." The other officer asked if he should call the Court Services and Offender Supervision Agency ("CSOSA") to see whether Blackson was subject to search as a condition of his probation. Brennan replied that he should. Gov't Ex. B at 14:25:00–14:26:18.

At 2:26 p.m., Brennan re-approached Blackson and asked him how old his children were. Blackson replied that they were 16, 17, and 19. Brennan asked whose backpack was in the car. Blackson replied that it belonged to his girlfriend's seven-year-old daughter. Brennan expressed skepticism that a green camouflage backpack belonged to a seven-year-old girl. Blackson replied "it's just a backpack, bro." Gov't Ex. B at 14:26:26–14:27:40.

At 2:28 p.m., Brennan radioed for a firearm-sniffing police dog to respond to the scene. Gov't Ex. B at 14:28:37–14:29:27. Brennan then spoke on the phone with a canine patrol officer, telling him, well within Callahan's earshot, that "we're still in the mission of the traffic

stop, so we're not prolonging anything, but I wonder if you guys could get over here" to conduct a canine sniff.  The canine patrol officer then gave Brennan an estimated time of arrival, to which Brennan replied "perfect."  Gov't Ex. B at 14:29:53–14:30:42.

At 2:30 p.m., Callahan informed Brennan that he had finished writing the first warning. Brennan inspected the warning and told Callahan to include Blackson's license class and the year that his registration would expire.  Gov't Ex. B. at 14:30:50–14:31:22.  At 2:31 p.m., Callahan asked Brennan to check the warning again because, Callahan stated, "I haven't done this in a long time."  Brennan told Callahan to include additional information including the color of Blackson's car.  Callahan told Brennan he would start drafting a warning for Blackson's heavy window tint, and Brennan said he would measure the tint.  Gov't Ex. A at 14:31:23–14:31:50. Brennan then measured the tint on the front windshield and each of the side windows, and confirmed that none of the windows were in compliance with D.C. Code.  Gov't Ex. B at 14:31:50–14:33:50; *see also* Hr'g Tr. at 35–36.

At 2:33 p.m., Brennan instructed Callahan to issue two separate warnings for the window tint—one for the side window and one for the front windshield.  Gov't Ex. B at 14:33:55– 14:34:07.  While Callahan began writing the second warning, Gov't Ex. A at 14:33:39–45, Brennan milled about for several minutes, repeatedly shining a flashlight into Blackson's car and asking Blackson additional questions about the potential presence of a firearm.  Gov't Ex. B at 14:34:40–14:38:07.

At 2:38 p.m., Brennan told Callahan, "we can write" Blackson a warning "for the [rear] tag cover" because Blackson's rear license plate frame was covering the words "District of Columbia."  Gov't Ex. B at 14:38:08–19.  Brennan then explained to Blackson that they would issue him a fourth warning for the rear tag cover.  Gov't Ex. B at 14:39:00–25.

At 2:39 p.m., Callahan finished writing a second warning and began writing a third warning. Gov't Ex. A at 14:39:40–14:40:29. Around the same time, officers from the Metropolitan Police Department's canine patrol unit arrived on the scene. Brennan explained to them that Callahan was still issuing "one last written warning" and that Blackson's story about the backpack "wasn't making sense." Gov't Ex. B at 14:39:30–14:40:12. At 2:42 p.m., a canine patrol officer asked Blackson and several of the officers standing near Blackson's car to move away in order to make room for the dog to sniff Blackson's car. Gov't Ex. B. at 14:42:02–50.

At 2:43 p.m., Officer Alston began conducting a dog sniff around Blackson's vehicle using a police dog named Joker. Gov't Ex. C at 14:43:45–50 (Alston Body-Worn Camera Footage). According to Officer Alston, Joker first alerted to the presence of a firearm at 2:44 p.m. and finished his sniff soon thereafter.[1] Officer Brennan then placed Blackson in handcuffs. Gov't Ex. B at 14:44:25–40. It took police 27 minutes from the initiation of the stop and 22 minutes from the completion of the database checks to conduct the dog sniff.

At around 2:45 p.m., Officer Callahan finished writing the third warning and began writing a fourth warning. Gov't Ex. A at 14:44:55–14:45:02. At 2:46 p.m., Officer Brennan searched the backpack and found a fully loaded handgun, several bags of marijuana, and two digital scales. Gov't Ex. A at 14:46:00–14:47:43; *see also* Hr'g Tr. at 47. At around 2:51 p.m., Officer Callahan completed the fourth and final warning, exclaiming "all done, a lot of scratching dude, a lot of writing." Gov't Ex. A at 14:50:55–14:51:10.

---

[1] The parties dispute whether and when Joker alerted to the presence of a firearm. But the court need not decide this issue. Even if the court credits Officer Alston's testimony that Joker first alerted at 2:44 p.m., police still violated the Fourth Amendment by unreasonably prolonging the stop up to that point. *See* Hr'g Tr. at 125 (Officer Alston testified that Joker first indicated after he sticks his nose into Blackson's car for the first time, when he "comes down, pauses, closes his mouth, and looks at me"); Gov't Ex. C at 14:43:55–14:44:02 (placing this moment at 2:44 p.m.).

In total, Callahan took roughly 29 minutes from the completion of database checks to write four warnings. Hr'g Tr. at 41. Although Brennan was more experienced writing D.C. tickets, he did not write any warnings. Hr'g Tr. at 50–53, 54–55. Nor did any of the numerous other officer present assist in writing warnings. Hr'g Tr. at 52–53. Instead, Brennan was largely focused on investigating Blackson's backpack, which was not related to the purpose of the traffic stop, and the other agents largely stood idle or assisted Brennan with his investigation into the backpack. Hr'g Tr. at 53–54.

## II.    LEGAL STANDARDS

The Fourth Amendment guarantees that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. A traffic stop "is reasonable," and thus consistent with the Fourth Amendment, "where the police have probable cause" or reasonable suspicion "to believe that a traffic violation has occurred." *United States v. Tucker*, 12 F.4th 804, 814 & n.2 (D.C. Cir. 2021) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). However, a traffic stop "that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

## III.    DISCUSSION

Blackson does not dispute that he was lawfully stopped for front license plate and window tint violations. Instead, he contends that police prolonged the stop to facilitate a dog sniff without reasonable suspicion to justify the extension. The court agrees.[2]

---

[2] Because the court can resolve both motions on this basis, it need not address Blackson's arguments that police physically intruded on a constitutionally protected space when Joker repeatedly intruded into Blackson's car and that Blackson's statements should be suppressed as the product of an un-*Mirandized* custodial interrogation.

**A. Police Prolonged the Stop**

A "traffic stop is 'more analogous to a so-called *Terry* stop than to a formal arrest,'"
*Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113,
117 (1998)), and "[l]ike a *Terry* stop, the tolerable duration" and "'scope'" of a traffic stop
"'must be carefully tailored to its underlying justification.'"  *Id.* (quoting *Florida v. Royer*, 460
U.S. 491, 500 (1983) (plurality opinion)).  Thus, a traffic stop "may 'last no longer than is
necessary to effectuate [its] purpose'" of addressing traffic infractions and "attend[ing] to related
safety concerns."  *Id.* (quoting *Royer*, 460 U.S. at 500).  Once the "tasks tied to the traffic
infraction[s] are—or *reasonably should have been*—completed," "[a]uthority for the seizure . . .
ends."  *Id.* (emphasis added).

Tasks within the scope of a routine traffic stop typically include checking a driver's
license, registration, and insurance, "determining whether there are outstanding warrants against
the driver," taking "negligibly burdensome [safety] precautions," and issuing tickets.  *Rodriguez*,
575 U.S. at 355.  "On-scene investigation into other crimes, however, detours from [a traffic
stop's] mission," and officers may not engage in such "unrelated checks . . . in a way that
prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining the
individual."  *Id.* at 355–56.  A dog sniff is aimed at detecting evidence of other crimes and thus is
not "part of the officer's traffic mission."  *Id.*  Accordingly, although police may conduct an
open-air dog sniff around the exterior of a lawfully stopped car to search for contraband, *see
Caballes*, 543 U.S. at 409, such a sniff may not prolong the traffic stop absent reasonable
suspicion.  *Rodriguez*, 575 U.S. at 357.

As an initial matter, the court disagrees with Blackson's contention that police prolonged
the stop by issuing a warning for the rear license plate and a second warning for the heavy

window tint.  True, "Officer Brennan's motivation was . . . clear—he wanted an excuse to search the backpack" and to "prolong the stop while they waited for a canine."  Def.'s Mot. to Suppress Physical Evid. at 8, 10, ECF No. 13.  But "the subjective intentions of the officer cannot invalidate the officer's 'objectively justifiable behavior under the Fourth Amendment.'"  *Fox v. District of Columbia*, 794 F.3d 25, 30 (D.C. Cir. 2015) (quoting *Wren*, 517 U.S. at 812); *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005) ("[T]he officers' actual motives . . . are not relevant as long as their actions were objectively reasonable." (cleaned up)).  And it was objectively reasonable for officers to issue both a rear-plate warning and a second window-tint warning—in addition to the two warnings Blackson does not contest.

To start, D.C. law contains separate prohibitions on heavily tinted windows.  One provision makes it illegal to have front windshields or windows that allow less than 70% light transference, while another prohibits less than 50% light transference on rear windshields or windows.  *See* D.C. Code § 50-2207.02(a)(1)(A) (front windows); *id.* § 50-2207.02(a)(1)(B) (rear windows).  It was thus objectively reasonable to issue two separate window-tint warnings, even if the officers incorrectly thought the distinction was between a windshield and a side window, rather than between the front and rear windows.  *See Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials[.]").

It was likewise objectively reasonable to issue a warning for the obstructed rear license plate.  D.C. law provides that no "brackets, holders, mounts, [or] frames . . . shall be mounted in such a way as to hide or obscure *any* portion of the vehicle identification tag or render *any* information on the vehicle identification tag illegible."  D.C. Code. § 50-1501.04a(b) (emphasis added).  Blackson's license plate frame obstructed the name of the issuing jurisdiction—the

District of Columbia—and thus, it was objectively reasonable for police to conclude that Blackson had violated this provision of the D.C. Code.  Officer Callahan reasonably understood D.C. law to require that "everything on the license plate must be visible," Hr'g Tr. at 36, even if he mistakenly cited a different provision of D.C. law.  *See Heien*, 574 U.S. at 60–61 ("To be reasonable is not to be perfect[.]").  The court thus concludes that all four warnings were objectively justified.

The court also disagrees with Blackson that Officer Brennan's initial questioning during the first five minutes of the stop—some of which was unrelated to the stop's mission—extended the stop's duration.  Police typically begin a traffic stop by checking a driver's record and determining whether there are outstanding warrants against the drive before deciding whether to issue a verbal warning, a written warning, or a ticket.  *See* Hr'g Tr. at 31–32; *see also Rodriguez*, 575 U.S. at 355.  Officer Brennan promptly handed Blackson's license to Officer Callahan, who ran these routine database checks during the first five minutes of the stop.  Brennan's initial questioning took place during these five minutes—while Callahan was completing the database checks and before the officers had decided how to proceed—and thus did not prolong the stop.

The court agrees with Blackson, however, that Officer Brennan unlawfully prolonged the traffic stop over the next 22 minutes before completion of the dog sniff by spending at least 17 minutes engaged in a firearms investigation into the backpack—wholly unrelated to the mission of the traffic stop—when he could have been assisting Officer Callahan in writing the four warnings.[3]  Had Officer Brennan focused on the traffic mission that justified the intrusion on

---

[3]  Officer Brennan was arguably engaged in mission-related tasks for approximately five of the next 22 minutes before police conducted the dog sniff.  Specifically, he reviewed the warnings drafted by Callahan, measured the tint on Blackson's vehicle, and explained to Blackson the issue with his rear license plate.  *See* Gov't Ex. B. at 14:30:50–14:34:26, 14:38:08–19.

Blackson's liberty, police would have completed the stop at least several minutes before they conducted the dog sniff.

As noted, a traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required" "to address the traffic violation[s] that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 350, 354 (cleaned up).  In determining the amount of time reasonably required to complete a traffic stop's mission, the court must "examine whether the police diligently pursued" mission-related tasks. *Id.* at 354 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (plurality opinion)); *see also United States v. Hutchinson (Hutchinson II)*, 408 F.3d 796, 802 (D.C. Cir. 2005) (explaining, in the context of a *Terry* stop, that a stop "last[s] no longer than . . . necessary to effectuate the purpose of the stop" if "police act[] diligently to [effectuate the purpose of the stop] *quickly*" (emphasis added) (cleaned up)).

Whether officers acted with reasonable diligence will depend on "the totality of the circumstances presented to them." *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); *see also Hutchinson II*, 408 F.3d at 799–800 ("[T]he permissible scope and duration of a *Terry* stop necessarily varies with the circumstances in each case.").  "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission." *Rodriguez*, 575 U.S. at 357 (cleaned up).  Although reasonable diligence does not require officers to "move at top speed or as fast possible," *United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005), nor "employ the least intrusive means conceivable," reasonable diligence does require "the least intrusive means reasonably available." *Hill*, 852

---

14:39:00–25.  Otherwise, Brennan spent his time standing by or investigating the backpack and looking for justification to search the backpack, including by repeatedly questioning Blackson about the bag, repeatedly inspecting the interior of Blackson's car, checking databases that Callahan had already run, strategizing with other agents present, and coordinating with the canine patrol unit.

F.3d at 381–82 (cleaned up); *see also United States v. Hutchinson (Hutchinson I)*, 268 F.3d 1117, 1120 (D.C. Cir. 2001) (explaining that, during a *Terry* stop, the "methods employed should be the least intrusive means reasonably available" (quoting *Royer*, 460 U.S. at 500)).  Police "may not perform [traffic] stops in a deliberately slow or inefficient manner in order to expand a criminal investigation within the temporal confines of the stop."  *United States v. Joseph*, 138 F.4th 797, 804 (4th Cir. 2025) (cleaned up).  And critically, it is the Government's burden to demonstrate that a stop "was sufficiently limited in scope and duration."  *Hutchinson I*, 268 F.3d at 1120 (quoting *Royer*, 460 U.S. at 500); *see also United States v. Mangum*, 100 F.3d 164, 169 (D.C. Cir. 1996).

The Government has failed to show that police conducted this stop in a reasonably diligent manner.  To the contrary, Officer Brennan's decision to delegate all four warnings to a single officer—especially one who was unfamiliar with the process of writing D.C. tickets—was slow, inefficient, and not the least intrusive means of completing the stop reasonably available under the circumstances.  At least a dozen officers were present.  Officer Callahan testified that Officer Brennan would have been more efficient at writing D.C. tickets given his D.C. experience.  *See* Hr'g Tr. at 50–51.  Yet the Government has offered no explanation for why it was reasonably diligent for a single inexperienced officer to handle all four warnings when a dozen officers were present.  Nor has the Government explained why it was reasonably diligent for neither Brennan nor any of the other officers present to assist Callahan in drafting the warnings.  It is no excuse that Brennan was busy leading a firearms investigation into the backpack—an investigation into crimes unrelated to the underlying traffic infractions may not "prolong[] the stop, absent . . . reasonable suspicion."  *Rodriguez*, 575 U.S. at 355.

The Government cites *Hill* for the proposition that it was not unreasonable for one officer "to stand next to the car during most of the stop, rather than to assist [the other officer] in completing the database searches" and writing the summonses "in the police cruiser." 852 F.3d at 383. But *Hill* is far afield. There, the officers had reason to believe the occupants of the car were armed and the court concluded that it was a negligibly burdensome safety precaution for one officer to "remain[] in the immediate proximity of the vehicle's occupants at all times" while the other officer handled the database checks and wrote two tickets. *Id.* at 384. Here, by contrast, by the time Callahan began writing tickets, Blackson had already been secured outside his vehicle and surrounded by several armed Marshals; he plainly posed no threat to officer safety. Brennan's 17-minute detour from the traffic mission was not a safety precaution, but instead an unrelated investigation into other crimes that prolonged the traffic stop.

Moreover, it bears emphasizing that *Hill* involved an ordinary traffic stop with only two officers present. As the Supreme Court has explained, during an "ordinary traffic stop," "the detained motorist is confronted by only one or at most two policemen." *Berkemer v. McCarty*, 468 U.S. 420, 438–39 (1984). In that typical scenario, there may be valid operational and safety justifications for assigning multiple citations to a single officer. But this court is required to consider "the totality of the circumstances presented to" the officers, which naturally includes the number of officers present. *Hill*, 852 F.3d at 381. Under the highly unusual circumstances in this case—a traffic stop for minor violations involving a dozen officers from three different law enforcement agencies—the Government has advanced no reasonable operational or safety justification for a single officer to write four tickets, nor can the court discern one. Officer Brennan's 17-minute detour from the traffic mission extended the intrusion on Blackson's liberty "beyond the time *reasonably required* to complete the [traffic] stop" and thus violated the Fourth

Amendment unless it was independently supported by reasonable suspicion. *Rodriguez*, 575

U.S. at 350 (emphasis added).

### B. Police Lacked Reasonable Suspicion to Prolong the Stop

"A traffic stop may be extended beyond the point of completing its mission if an officer

develops a reasonable suspicion of criminal activity." *United States v. Wallace*, 937 F.3d 130,

138 (2d Cir. 2019) (cleaned up); *see also United States v. Maynard*, 615 F.3d 544, 553 (D.C. Cir.

2010) (holding that reasonable suspicion justified the extension of a traffic stop). Reasonable

suspicion requires "a 'particularized and objective basis' for suspecting legal wrongdoing."

*United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411,

417–18 (1981)). Although reasonable suspicion is less than probable cause and "considerably"

less than a preponderance of the evidence, "a mere hunch is insufficient." *Id.* at 274 (cleaned

up). In assessing reasonable suspicion, the court must consider the "totality of the

circumstances" and take care to avoid "divide-and-conquer analysis." *Id.* at 273–74.

The Government contends that police had reasonable suspicion to prolong the stop. It

points to: (1) Blackson's criminal history of firearm possession; (2) the allegedly awkward

position of the backpack tucked behind the reclined passenger's seat; (3) Blackson's alleged

nervousness and "misdirection"; (4) Blackson's shifting story about whom the backpack

belonged to; and (5) the implausibility that a larger green camouflage backpack belonged to a

seven-year-old girl. Gov't Opp'n to Def.'s Mot. at 17–20, ECF No. 19. The latter two factors

cannot be considered, and the first three factors do not establish reasonable suspicion.

The latter two factors cannot be considered because they are the fruits of Officer

Brennan's extension of the traffic stop. Information that Brennan obtained by engaging in

unrelated inquiries that prolonged the stop cannot be used to backfill a justification for that

extension. *See United States v. Spinner*, 475 F.3d 356, 359 (D.C. Cir. 2007) ("A search not justified when it is begun cannot be used to elicit evidence with which to justify the search after the fact." (cleaned up)). Blackson allegedly shifted his story and said that the backpack belonged to his girlfriend's seven-year-old daughter several minutes after Callahan completed the database checks and began writing tickets. *See* Gov't Ex. B at 14:26:26–14:27:40. At this point, Officer Brennan should have been focused on the diligent completion of the traffic mission rather than engaged in unrelated investigation into other crimes.

The other three factors fall short of reasonable suspicion. First, the Government asks the court to credit Officer Brennan's statement—tepidly conveyed in an unsworn statement on body-worn camera footage—that Blackson had shown "just a little bit of nervousness" and was "not acting right" when asked about the backpack. Gov't Opp'n at 19. Although "the court's role is to decide whether [an] officer's inference from the facts" based on his training and experience "was 'reasonable,'" *United States v. Prandy-Binett*, 995 F.2d 1069, 1071 (D.C. Cir. 1993) (quoting *United States v. Ortiz*, 422 U.S. 891, 897 (1975)), it is difficult for the court to credit Officer Brennan's statement that Blackson appeared a little nervous when Brennan did not testify at the suppression hearing and was never cross-examined about this statement. In any event, the argument that Blackson made "sudden attempts at misdirection" which were indicative of nervousness is belied by the body-worn camera footage, which shows that Blackson remained calm and polite during Brennan's initial questioning and merely inquired—as he had every right to do—into why Brennan wanted to intrude on his privacy. Gov't Ex. B. at 14:19:23–14:20:43. The court finds that Blackson simply did not appear to be nervous or agitated. And of course, Blackson's assertion of his rights and refusal "to consent to a search cannot be used as evidence in support of reasonable suspicion." *United States v. Machuca-Barrera*, 261 F.3d 425, 435 n.32

(5th Cir. 2001).  "If refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections."  *United States v. Santos*, 403 F.3d 1120, 1125–26 (10th Cir. 2005); *see also United States v. Carter*, 985 F.3d 1095, 1098 (D.C. Cir. 1993).

That leaves Blackson's criminal history of firearm possession, and the allegedly awkward position of the backpack tucked behind the reclined passenger seat.  Taken together, these two factors still fail to establish reasonable suspicion.  Although the court does not take lightly Blackson's prior conviction for armed murder, the Fourth Amendment "does not allow police officers to round up the usual suspects."  *United States v. Castle*, 825 F.3d 625, 629 (D.C. Cir. 2016) (cleaned up).  "Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches."  *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005).  Thus, while Blackson's *past* conviction for a violent crime is surely relevant to the reasonable suspicion analysis, it can "not substitute for objective indications of *ongoing* criminality."  *Castle*, 825 F.3d at 629 (cleaned up) (emphasis added).  An officer relying on "an individual's criminal record is required to pair that knowledge with concrete factors to demonstrate that there is a reasonable suspicion of *current* criminal activity."  *Id.* (cleaned up) (emphasis added).

The only concrete fact to which the Government can point is the position of the backpack behind the reclined seat, but that fact is "entirely mundane."  *Castle*, 825 F.3d at 630.  It is not unusual for a driver to have his or his child's backpack or other bags on the back seat floor.  And it is entirely innocent and "commonplace" for a front seat passenger to sit with the seat reclined and leave it in that position when they exit the car.  *Id.*  The Government's contention that the position of the backpack was suspicious appears to rest on the premise that Blackson may have been trying to hide the backpack from public view.  *See United States v. Massenburg*, 654 F.3d

480, 491 (4th Cir. 2011) ("The Government must also be able to either articulate why a particular behavior is suspicious [or why it is] indicative of some more sinister activity than may appear at first glance." (cleaned up)).  But the backpack was not concealed.  Indeed, Officer Brennan spotted it as soon as he looked at the back seat.  And tellingly, Brennan did not mention the supposedly suspicious position of the backpack when he and another officer were brainstorming a basis to search the backpack while in the cruiser.  In sum, the Government has failed to establish reasonable suspicion.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS Blackson's Motion to Suppress Physical Evidence and Supplemental Motion to Suppress Statements.

Date: January 8, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge